UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
SERENE R. WRIGHT and JOSEPHINE DEJESUS,

     Plaintiffs,

  -against-         COMPLAINT

ETHICAL CULTURE FIELDSTON SCHOOL,  (Jury Trial Demanded)
JESSICA BAGBY, ROBERT CAIRO, NIGEL
FURLONGE, and JOHN AND JANE DOES,

     Defendants.

------------------------------------------------------------x

  Plaintiffs, Serene R. Wright and Josephine DeJesus, by their undersigned

attorneys, hereby allege as and for their Complaint as follows:

PARTIES

  1. Plaintiff Serene R. Wright ("Wright") is a person of color and a former

student at Defendant Ethical Culture Fieldston School.

  2. Plaintiff Josephine DeJesus ("DeJesus") is a person of color and the

mother of Serene R. Wright.

  3. Defendant Ethical Culture Fieldston School ("ECFS") is and was at all

relevant times an exclusive, expensive, and predominately white private school

located at 3901 Fieldston Road, Bronx, New York 10471.

  4. Defendant Jessica Bagby was at all times relevant to this Complaint the

Head of School at ECFS.

5.      Defendant Robert Cairo was at times relevant to this Complaint from about 2017 through about 2020 the Principal of ECFS's high school, which is known as the Upper School.

6.      Defendant Nigel Furlonge was at times relevant to this Complaint after about 2020 the Principal of the high school.

7.      Defendants John and Jane Does are individual employees or agents affiliated with ECFS whose identities are at this time unknown and will be added as Defendants at a later date.

JURISDICTION AND VENUE

8.      This action arises from 42 U. S. C. § 1981 as well as New York State and New York City laws, all of which prohibit racial discrimination and retaliation on the basis of race and color.

9.      Venue is proper in this District because the events relevant to this Complaint and the claims arose in this District.

STATEMENT OF FACTS

*Introduction*

10.      Wright is an academically gifted student, who after middle school, sought an educational environment that would enable her to achieve her full potential in high school.

11.      Wright, with the close support and assistance of her mother DeJesus,

successfully competed for acceptance at ECFS, and received scholarships from ECFS as a lower-income minority student.

12.    Wright attended ECFS as a student from September of 2017 until her graduation in June 2021.

13.    ECFS betrayed its promise as a supportive and welcoming school for students of color like Wright by denying her the same opportunities and benefits that were provided to white students; by discriminating against her because of her race and color; and by subjecting her to severe and pervasive racial animus that took a toll on her self esteem, her academic confidence, and her physical and mental health.

14.    At ECFS, Wright and her mother, DeJesus, were both exposed to false, pervasive, and racially-biased stereotypical attitudes held, openly displayed, and acted out by white students, their parents, and the ECFS faculty, staff, and administrative employees, including the individual defendants in this action.

15.    The racially charged school atmosphere that Wright and DeJesus endured included specific and particularly offensive assumptions that students of color were unfairly receiving financial scholarships and not paying the full or fair cost of tuition and thus not entitled to receive at the same level support services from the school; that students of color were poor; that students of color were admitted to the school based merely on their color and that they lacked the academic abilities of white students; and above all, students of color at ECFS were not entitled to or

deserving of equal or fair treatment at the school or by the school.

*The Mutation of Ethical Culture Fieldston School*

16.     ECFS was founded in the late 19th century by Felix Alder as a free school serving the poor children of the City of New York. Yet ECFS abandoned long ago the Alder principles and is now an elite and expensive school that promotes itself as an educational institution that puts its students on track to be admitted to selective colleges and universities in the United States, particularly Ivy League and other top schools in the country.

17.     By recruiting students such as Wright, ECFS attempts to showcase its ethical roots by holding itself out to the public as a liberal, inclusive, and racially diverse school; in fact, it is an elitist school controlled by a board of directors and wealthy, entitled, predominantly white individuals who purposefully and intentionally discriminate against persons of color, maintain negative stereotypical attitudes about students of color, and suppress enforcement of the school's Code of Conduct regarding racially offensive behavior.

18.     Prior to Wright's enrollment at ECFS's Upper School, the Principal of the Lower School, George Burns, attempted to address issues of race at the school. Burns created a "Conversation About Race" program where fourth and fifth graders are placed in discussion groups for the purpose of talking about and learning about race, racism, and its effect on all cultures.

19.     Burns also made it clear to students, parents, educators, and other staff at the school that offensive racial comments would not be tolerated; for example, on one occasion when a fifth grader used the n-word toward a student of color, Burns required the fifth grader to read an apology to the student in front of the entire fifth-grade class.

20.     Although Burns' "Conversation About Race" program gained national acclaim, many of the white parents and educators at the school objected.

21.     During the course of the 2016-2017 academic year, the school hired Defendant Bagby as the Head of School, and one of Bagby's first acts in 2016 was to admonish Burns for his program that, she said, several white parents (who she described as "Zionists" and "Jews") found objectionable.

22.      Burns filed a formal complaint against Bagby with the ECFS human resources department based on what he perceived were Bagby's racially charged comments about race, ethnicity, and religion.

23.     ECFS did not address Bagby's misconduct; instead, it investigated Burns, found that *he* was insensitive to female staff, and forced *him* to resign in June of 2017.

24.     By the time Wright enrolled at ECFS in September of 2017, the school abandoned any good-faith efforts to provide an equal and inclusive educational environment for students of color.

25.     As an institution and by means of the practices and policies set forth below, ECFS purposefully and intentionally discriminated against persons of color, including Wright and DeJesus, and purposefully and intentionally retaliated against persons of color, including Wright and DeJesus, who complained about racism at the school.

26.     As an institution and by means of its practices and policies, ECFS is intentionally and deliberately indifferent to the racially toxic environment that exists and persists at the school.

27.     During the time of her enrollment at ECFS, Wright and other students of color witnessed, or became aware of numerous racist incidents, where white students used the n-word when addressing or referring to black or brown students at the school or otherwise acted in a racially hostile matter toward students of color at the school.  Rather than address such conduct in a direct manner, as handled by former Lower School Principal Burns, Bagby, Furlonge, and Cairo pretended that it did not happen.

28.     Although the use of a racial slur or a racially derogatory statement violated the school's Code of Conduct, ECFS did nothing whatsoever to address the ongoing abuse of students of color, and it became common knowledge that racially offensive conduct would not be addressed or punished.

29.     Upon information and belief, the school had at the time and continues

to have a practice and *de facto* policy of not disciplining white students for racist

conduct.

30.     Upon information and belief, the disciplining of a white high school

student for making a racist comment or otherwise acting in a racially discriminatory

manner toward a student of color should lead to a form of school-initiated

disciplinary action that would in the ordinary course, if substantiated, be reported as

part of an application to any college or other school for which the student later

sought admittance.

31.     Rather than disciplining students for racist acts, ECFS purposefully and

knowing refused to take proper action, and as a result, ECFS knowingly created a

racially hostile environment at the school and knowingly permitted that environment

to persist throughout the time that Wright attended ECFS.

32.     ECFS also purposefully and intentionally refused to conduct proper

investigations into racism at the school.  For example, in the academic year just

before Wright joined the school, in 2016, as a "senior prank" a group of white

students brought into the school several dozen large watermelons and littered the

entire office of a black mid-level administrator at the school with the watermelons.

33.     Although the black administrator was shocked and deeply hurt by this

blatantly racist affront and although word of the offense became widely known

throughout the school, ECFS intentionally and knowingly refused to conduct any

kind of investigation because it did not want to punish or discipline the white students for their racist stunt.

*Wright's Early Experiences at the School in the 2017-2018 Academic Year*

34.     As a freshman at the School for the 2017-2018 academic year, Wright was exposed to a racially hostile environment from the outset.

35.     Initially, Wright believed in ECFS's promise to support racial and ethnic diversity and to promote innovative, inclusive thinking and action by all students.

36.     In that spirit, Wright joined the water polo team at ECFS, but quickly learned that the school's advertised inclusiveness was a sham. Wright was the only black girl on the team and was never integrated or welcomed by the other students or the coaches.

37.     While on the team, the all-white team members shunned Wright by regularly leaving her out of team discussions or other group activities.  None of the coaches or other staff at the school made any genuine effort to treat Wright as an equal on the team.  After a few months, Wright realized she would never be accepted as part of the team because of her race and withdrew from the water polo program.

38.     During her freshman year, white students in her class called Wright a "poor" and "angry" black girl and a "scholarship kid who couldn't afford the tuition."

39.     These early affronts to Wright's self-esteem started to take a toll on

Wright and her mother, DeJesus, who watched her intelligent, vibrant and happy child descend into cycles of depression and anxiety.

40.     The use of social media provided another means whereby blatant racism was condoned by ECFS.  During Wright's spring semester in 2018, the entire school community, including Wright and DeJesus, was exposed to a widely disseminated video of two white seniors singing a song in which they repeatedly used the n-word.

41.     As with the other examples of racism, ECFS, Bagby, Furlonge, and Cairo refused to take disciplinary action against the two students, failed to charge them with violations of the Code of Conduct, and permitted them to graduate from the school later that same semester without having any notation in their school records that these two students had violated the Code of Conduct by publishing racially offensive music lyrics.

42.     During that same period of time in the spring of 2018, an ECFS student of color and his parents brought a lawsuit against the school and Bagby charging racial discrimination and retaliation. *See M.H.B., et al. v. Ethical Culture Fieldston School, et al.,* Bronx Supreme Index No. 23518/2018E at ECF Doc. # 1.

43.     The *M.H.B.* suit accused Bagby and ECFS of retaliation for falsely reporting the parents to New York City's Child Protective Services for parental neglect of their child.

44.     Word of the lawsuit quickly circulated throughout the ECFS community.

45.     In response, Bagby publicly attacked the student and his parents in an email to the entire ECFS community accusing them of filing a "baseless lawsuit" and "profiteering" at the expense of student safety by challenging the school's decision to contact Child Protective Services.  *Id.* at ECF Doc. # 2 ¶ 77 (Amended Complaint).

46.     Bagby's email was intended to humiliate anyone speaking out about racial bias and to suppress any effort by students of color or their parents to assert their rights to be free from racism or retaliation at the school.

47.     As a result of Bagby's public attack vilifying the M.H.B. plaintiffs, Wright and DeJesus understood that the school leadership would harshly retaliate against students and parents who spoke out against racism.

48.     At the same time, it was clear to students of color and their parents that unchecked racism was rampant at the school.

49.     In discussions with other students of color during her freshman year, Wright learned that there was a history of untreated racism at the school.  For example, Wright learned during the course of the 2017-2018 academic year that white students at the school repeatedly taunted a black girl about her hair without consequences; that a black boy was called the n-word by a white student in the

middle school who also used a sweater to whip the black boy while repeatedly calling him the n-word; and that a lower school white student used the n-word while in class and no corrective action was taken by the school.

50.    Wright was made to feel that she did not belong at ECFS and suffered a loss of self-esteem and self-confidence as a result of being shamed for her race and color.

51.    Wright quickly became a "C" student at ECFS, a significant drop from her academic record and capabilities as an "A" student, as a result of being shamed for her race and color at the school,

*The Racially Hostile Environment Continues*

52.    In Wright's sophomore year at school (2018-2019), Wright enrolled in an intensive Humanities class, which met eight times a week and covered subjects in History, Ethics, and English.

53.    In the 2018 fall semester, the class began a discussion about slavery and the country's early origins.  Several of the white male students made racially offensive remarks during class discussion, including statements to the effect that the legacy of slavery was not as bad as it seemed because "the slaves didn't know that they were being mistreated," a thinly veiled suggestion that slaves were too stupid or not sufficiently human to warrant different treatment.

54.    Another white male student in the Humanities class stated during the

11

course of an open class discussion that it was "fascinating how [white] masters treated their [black] slaves," another remarkably incentive remark that suggests that physical domination, abuse, and destruction of a person's soul could be a mere matter of abstract academic interest.

55.    And another student in Wright's Humanities class suggested that abuse of Native American women was acceptable because male Native Americans treated "their" women horribly and "they" ought not to expect that members of the white race should treat them any differently.

56.    Although Wright initially attempted to speak directly with these students in order to make them aware of the harsh effect their comments had on students of color or persons from another culture or ethnic group, the white male students dismissively rejected Wright's attempts at a rational dialogue.

57.    Wright also raised her concerns directly with the three teachers of the Humanities class (Karen Drohan, Gina Apostol, and Roy Blumenfeld) but none of them were willing to address the issue and, instead, dismissed Wright's concerns as her being "overly sensitive."

58.    The refusal by these teachers to discuss issues of racial insensitivity or hostility represents a complete departure from the school's founding principles and the discarded efforts by former Principal Burns to address the racially hostile environment manifest at the school.

59.     In October of 2018, Wright brought her concerns about racism at the school to Jeffrey Cox, a Black man who was the Director of Student Wellness.

60.     Wright told Cox that the students of color did not believe that the teachers, administrator, or other officials at the school were supportive of the difficulties facing students of color at the school.

61.     Wright told Cox that students of color often felt unsafe in class and that teachers minimized their complaints about direct or indirect forms of racial hostility.

62.     Wright as well as other students of color told Cox that students of color were fearful that if they approached white school professionals, such as school psychologists or administrators, with their concerns or the effect of racism, they ran the risk that the school would wrongfully report the families of color to Child Protective Services, as had been done in the past.

63.     Wright was the first of many students of color to approach Cox about racism at the school because Cox, unlike the leaders and administrators at the school, attempted to address these issues with the school administrators and educators.

64.     For example, during the course of the school year, educational professionals regularly met in groups known as "Student Success Teams" to discuss the performance of the students.

65.      On numerous occasions in 2018 and 2019 Cox tried to mobilize the members of these groups to address the concerns raised with him by Wright and

other students of color about unaddressed racism.

66.     Cox, as a mental health professional, wanted the educational professionals in the Student Success Teams to confront racism directly and to make it clear through consequences that racism would not be tolerated.

67.     Cox also wanted the Student Success Teams to understand that students of color, such as Wright, needed additional support and flexibility precisely because of the ongoing traumatic drain on their well-being.

68.     Cox, like Burns, was eventually fired by the school because he opposed racism at the school; however, before his own termination, Cox continued his futile efforts to get ECFS to address the growing problem of unchecked racism at the school.

69.     Cairo, who ran the Student Success Teams as a senior administrator at the school, rejected Cox's suggestions that racism be confronted and that additional support be provided to students of color.

70.     Indeed, Cairo completely discredited Wright's situation and suggested without basis that Wright was being "overreactive" and was simply "acting out" to get attention.

71.     Cairo even suggested, again without basis, that Wright was not a serious student, spent too much time partying and "having sex" and that Wright and other female students of color simply did not belong at ECFS.

14

72.     Cairo's comments betray racial stereotypes about black and brown teenage girls that were also held by other ECFS faculty and staff.

73.     Those racial stereotypes underlie ECFS's deliberate treatment of students of color as being on less than equal footing with their white counterparts at the school.

74.     Unchecked racism persisted.  Later the same semester, in November 2018, several white male high school students at ECFS participated in a widely publicized "pledge" within their group not to masturbate during the entire month of November.

75.     In order to encourage members of this particular group of white teenage boys to maintain their pledge it became common knowledge at ECFS through social media and other means that the members of this group would look at photographs of teenage girls of color at the school in order to "assist" them in maintaining their pledge.

76.     Knowledge of the pledge, which was known as "No Nut November," spread throughout the school, and once again ECFS, Bagby, Furlonge, and Cairo purposefully and deliberately failed to take any disciplinary action against these male white students for their blatantly racist and deeply hurtful and abusive conduct.

77.     Wright suffered a deep sense of shame and humiliation as a result of the "No Nut November" pledge because she was a young black girl who was an object

of disgust because of the color of her skin.

78.    The pervasive racist environment at ECFS had a profound impact on
Wright and DeJesus.

79.    In December of 2018, Wright began reporting to Cox in one-on-one
counseling sessions because she was experiencing severe social anxiety and
depression and was having difficulty keeping up with her schoolwork.

80.    As a result of Wright's reports to Cox, Cox arranged for educational
and disability professionals to assess the impact of Wright's emotional state on her
ability to carry on her schoolwork.

81.    Based on these assessments, Wright received properly-documented
recommendations that ECFS provide Wright with additional academic support as
well as standard emotional support services offered to all students in need at the
school.

82.    Bagby, Cairo, and other administrators at ECFS refused to provide
these standard services to Wright and, instead, began advocating for Wright to be
removed from the school despite the standard practice of permitting a struggling
student the opportunity to employ those services before taking drastic or disciplinary
action.

83.    Wright's advisory teacher, Grace Yun, told Wright "this school may not
be right for you," which Wright understood to mean that the High School Principal

and the Head of School wanted Wright to leave.

84.     Cairo also told Cox that Cox should counsel Wright to leave the school.

85.     Upon information and belief, Cairo and other administrators at the school believed that Wright, as a black scholarship student, was a "drain" on school resources and that she was not entitled to the same level of support as other students who were paying full tuition.

86.     This "less-than" attitude about students of color worked its way into the way that staff at the school treated students of color.

87.     In January of 2019, Wright was a few minutes late to her Algebra II class, which was being taught by Gina Moreno, a white female teacher.

88.     While students and teachers are on occasion a few minutes late for a class, on this particular occasion, Moreno loudly berated Wright in front of the entire class.

89.     When Wright, humiliated by the unjustified attack, left the classroom to seek help from Cox, the Director of Student Wellness, Moreno inexplicably abandoned the classroom and followed Wright across the school campus, all the while continuously berating and yelling at Wright until they both arrived at Cox's office.

90.      Moreno barged into Cox's office and continued to castigate Wright in the presence of Cox and another student in his office.

91.     Both Wright and the other student were shocked by Moreno's conduct, and Cox attempted to de-escalate the situation.

92.     Wright was so distraught that DeJesus had to leave her work early to come to school that day to take Wright home.

93.      Cox reported Moreno's rant against Wright to Furlonge and Cairo. True to ECFS's "blame-the-victim" form, it was *Cox* who was reproached for making Moreno feel victimized by accusations of unprofessional conduct, and Wright was blamed for provoking Moreno's outburst.

94.     In February of 2019, another white ECFS student posted an online video widely disseminated throughout the school in which the white student referred to a male black student at ECFS as a "nigger," and in unison with two other white ECFS students, called the same black student a "crack nigger."

95.     Again, nothing was done by ECFS, Bagby, Furlonge, or Cairo to discipline these three students for violating the Code of Conduct.

96.     In response to the ongoing and pervasive racist environment at ECFS, the next month, in March of 2019, over 50 students of color, including Wright, as well as many supportive white students at ECFS, occupied one of the buildings at the school and conducted a three-day and three-night sit-in to protest the ongoing racism at the school.

97.     During the course of the sit-in, Bagby admitted that the school was

responsible for the racially toxic environment at ECFS.  Bagby stated that:

> "The current situation rises out of *multi-year racial trauma* our students
> have experienced while *at our school*. My colleagues and I could not be
> more profoundly sorry for this reality, which we fully recognize has
> weighed on the minds, hearts, and spirits of our students of color and their
> families *for years*." (emphasis added).

98.     Soon after the sit-in was resolved with promises of reform, ECFS

started retaliating against students of color.  For example, Wright's Physics teacher,

Juan Botella, simply stopped calling on students of color in his class and acted as if

they were not members of the class or the school.

99.     As a result of the March 2019 sit-in demonstration and as a result of the

systemic and blatant racism at the school, numerous students of color and their

parents, including Wright and DeJesus, began speaking out or began speaking out

more loudly about the racially hostile environment at ECFS.

100.   By May of 2019, Wright was formally diagnosed as having Major

Depressive Disorder, Anxiety Disorder, and Insomnia Disorder.  Her symptoms

include suicidal ideation, headaches, and stomachaches.  Wright was proscribed

medication as well as ongoing therapy to address these serious mental health

conditions.

101.   Rather than take the required steps to address the issues highlighted by

the March 2019 demonstration, the school instituted a formal policy of retaliating

against any student or parent who complained about discriminatory treatment at the

school.

102.    Under that policy, no matter what the circumstances, in the event that a student or parent complained about discrimination, then investigatory agents at the school were required: (1) to establish a "defensible position" regardless of the circumstances; and (2) to conduct an invasive and needless investigation about the complaining student's background in order to tarnish the victim as a wrongdoer, regardless of the facts or the merits of the circumstances, and thereby discourage further complaints of discrimination.

103.    Students of color were also told that if they engaged in further protests of any kind, they would not be permitted to graduate.  In about June of 2019, Furlonge selected Lucas Kaminow to be the graduation speaker for the June 2019 graduation, and several students of color told Furlonge that that particular student was an especially bad choice because of the student's well-known history of racist conduct.

104.    Furlonge flatly rejected the concern; told the students that Kaminow would be the graduation speaker, and that should any student of color engage in any form of protest, such as taking a knee, that student would not be permitted to graduate.

105.    By the summer of 2019, Wright's mental health condition dramatically worsened, and as a result, Wright required intensive and frequent psychological and

psychiatric care under a crisis-management course of treatment.

106.   As a result of Wright's deteriorating mental health, in June of 2019, DeJesus applied for and received unpaid family medical leave from her position at the Metropolitan Transit Authority so that she could stay home during the day with Wright who was on "suicide watch," a status that required DeJesus to be present and available at a moment's notice to monitor and care for her daughter.

107.   By the end of the summer, DeJesus was able to return to work as the crisis subsided.

108.   Nevertheless, by Wright's junior year at ECFS, she was continually treated for ongoing emotional stress caused by the racially toxic environment at the school.

109.   Wright's emotional distress continued throughout the remainder of her time at ECFS; and she still suffers from the trauma of that experience today.

110.   In December of 2019, DeJesus attended a meeting at the school to discuss Wright. Several members of the school staff, including Cairo, Cox, Wright's advisory teacher (Grace Yun), and two school neurologists or psychologists (Dr. Leno and Dr. Sharma), attended the meeting.

111.   During the course of the December 2019 meeting, Cairo stated that Wright was simply not capable of handling the academic requirements of the school and suggested (again) that Wright leave the school.

112.   Dr. Sharma, who was the senior psychologist at the school, contradicted Cairo and informed the group that, based on her assessments, Wright was one of the most intelligent students at the school; that Wright clearly had the ability to keep up academically; and that Wright needed the support services that Cox (and others) had been advocated for.

113.   Cairo became enraged at these comments by Dr. Sharma, which flatly contradicted (and exposed) Cairo's biased thinking.

114.   Rather than continue the discussion, Cairo slammed his laptop shut and stormed out of the room.

115.   Throughout Wright's senior year at ECFS (2020-2021), Wright continued to struggle with depression, anxiety, and lack of sleep.

116.    Throughout Wright's final year at ECFS, the school continued to refuse to make any kind of good-faith efforts to provide Wright with the accommodations and services that it afforded to white students.

117.   In the spring of Wright's senior year, one of Wright's close friends and classmates at the school was called a "fucking nigger" by two other white seniors at the school.

118.   The students of color at ECFS were, once again, shocked at the school's utter indifference to rampant racism, particularly since Bagby told the students of color that the school was going to take serious steps to address racism at the school

22

after the March 2019 sit-in demonstration.

119.   Once again, there was again no consequence for racist behavior and there was no formal punishment given to the two white seniors who called a black student a "fucking nigger."

120.   The school permitted the two white students to graduate in June 2021 without a report or other blemish on their school records.

121.   In sharp contrast, on the day of her graduation, Kenny Graves, an Assistant Principal at the high school, told Wright that the school was withholding her diploma on the pretextual ground that she did not satisfy all graduation requirements.

122.   According to the school, Wright purportedly failed to satisfy certain academic requirements, requirements that would not have created an issue for a similarly-situated white student in comparable circumstances.

*Institutional Racism at ECFS*

123.   The systemic nature of the school's racism is revealed by the way ECFS evaluated the academic performance of students of color.

124.   At times relevant to this Complaint, about 20 percent of the high school consists of students of color and about 80% of the students are white.

125.   Throughout high school (and the lower schools), ECFS maintained four different levels for the study of mathematics, and the school determined the

placement of each student, including Wright, in one of the four levels of mathematics, based purportedly on the student's ability in mathematics.

126.   In the ordinary course and in the absence of discrimination, the distribution of students in the various levels of mathematics should be reflective of the entire population of students for each grade.

127.   At ECFS, however, about 60% of the students in the lowest level of mathematics were students of color, which represented a significant statistical departure from the standard deviation that would be otherwise expected from an objective and unbiased evaluation of each student's abilities.

128.   Throughout Wright's time at the high school, Wright was placed in the next or second level of mathematics, even though her abilities justified a higher placement in the third or fourth level.

129.   Throughout Wright's time in second-level mathematics, only a few of the students in the class were students of color, which is also a significant statistical departure from the standard deviation that would be otherwise expected from an objective and unbiased evaluation of each student's abilities.

130.   As a result of the school's racist attitudes and racial stereotyping of students of color, Wright and other students of color were improperly placed in a lower level of mathematics than their abilities justified.

131.    As a result of her placement in mathematics throughout high school,

Wright was denied important academic benefits and college opportunities that were afforded to white students.

132.   For example, the opportunity to demonstrate a high aptitude in mathematics is an important factor in how well a student does in being accepted by a top-level college or university, and by being kept in a lower level of mathematics, Wright was denied this opportunity.

*Damages*

133.   As a result of the Defendants' conduct, Wright and DeJesus have suffered severe emotional trauma, and Wright has suffered from depression, anxiety, a sleeping disorder, and a loss of self-confidence and self-esteem.

134.   Wright and DeJesus continue to suffer emotional trauma from their experiences at ECFS; disturbing, reoccurring, and intrusive thoughts about ECFS still dominate their lives.

135.   DeJesus was traumatized by the way that the school treated her daughter; by the way the school refused to provide in good faith support services for her daughter; and by the way that the racially toxic environment damaged her daughter.

136.   Wright's mental health issues, particularly Wright's reoccurring thoughts of suicide, had a profound impact on DeJesus's own mental health because DeJesus's day at work was often filled with anxiety about her daughter and the

prospect of suicide.

137.   Defendants ECFS, Bagby, Furlonge, and Cairo have acted maliciously and knowingly in violating the Plaintiffs' rights and are liable to the Plaintiffs for punitive damages as well as compensatory damages.

FIRST CLAIM FOR RELIEF
(42 U. S. C. § 1981 Discrimination and Retaliation)

138.   Plaintiffs repeat the foregoing allegations as if set forth herein at length.

139.   Defendants, acting on the basis of racial discrimination, have denied the Plaintiffs the full and equal benefits of all law, proceedings, and contractual relations for the security of persons and property as are enjoyed by white persons, in violation of 42 U. S. C. § 1981.

140.   Defendants have denied the Plaintiffs the equal terms and conditions of the contractual relationship in connection with the Plaintiffs' enrollment at ECFS as those terms and conditions are enjoyed by white persons.

141.   As a direct and proximate result of the Defendants' unlawful actions, the Plaintiffs have suffered damages, including monetary loss and mental anguish, emotional distress, embarrassment, stress, anxiety, and loss of self-esteem, for which they are entitled to an award of money damages in an amount to be established at trial.

## SECOND CLAIM FOR RELIEF
(New York Executive Law Discrimination,
Retaliation, and Aiding and Abetting)

142.   Plaintiffs repeat the foregoing allegations as if set forth herein at length.

143.   Defendants have violated New York Executive Law § 296 *et seq.,* by discriminating against the Plaintiffs on the basis of their race and have specifically violated New York Executive Law § 296(4) by permitting and aiding and abetting harassment at ECFS against the Plaintiffs because of their race and color.

144.   Defendants have violated New York Executive Law § 296 *et seq.,* and § 296(7) by retaliating against the Plaintiffs for opposing the Defendants' unlawful practices and by taking actions against them that were designed to inhibit or punish the Plaintiffs from exercising their rights.

145.    As a direct and proximate result of the Defendants' unlawful actions, the Plaintiffs have suffered damages, including monetary loss and mental anguish, emotional distress, embarrassment, stress, anxiety, and loss of self-esteem, for which they are entitled to an award of money damages and in an amount to be established at trial.

146.   Defendants Bagby, Cairo, Furlonge, and Defendants John and Jane Does knowingly and actively participated in and aided and abetted the unlawful practices, discrimination and retaliation against the Plaintiffs in violation of the New York Executive Law.

27

## THIRD CLAIM FOR RELIEF
### (New York City Administrative Code Discrimination, Retaliation, and Aiding and Abetting)

147. Plaintiffs repeat the foregoing allegations as if set forth herein at length.

148. Defendants have discriminated against the Plaintiffs as providers of a public accommodation; have retaliated against Plaintiffs on account of their race and color and for engaging in protected conduct; and have interfered with their protected rights, in violation of New York City Administrative Code § 8-107(4), § 8-107(7), § 8-107(19) and § 8-107 *et seq*.

149. Pursuant to NYC Adm. Code §8-502(c), the Plaintiffs will serve a copy of this Complaint to the NYC Commission on Human Rights and the NYC Law Department.

150. As a direct and proximate result of the Defendants' unlawful actions, the Plaintiffs have suffered damages, including monetary loss and mental anguish, emotional distress, embarrassment, stress, anxiety, and loss of self-esteem, for which they are entitled to an award of money damages in an amount to be established at trial.

151. Defendants Bagby, Cairo, Furlonge, and Defendants John and Jane Does knowingly and actively participated in and aided and abetted ECFS's unlawful practices, discrimination, and retaliation against the Plaintiffs in violation of New York City Administrative Code § 8-107(6).

WHEREFORE, the Plaintiffs demand the following relief jointly and severally against all Defendants:

(a)     a declaration that each one of the Defendants violated the Plaintiffs' federal rights as well as their rights under the laws of the City of New York and the State of New York;

(b)     compensatory damages for emotional and reputational injuries suffered by the Plaintiffs by reason of each Defendant's unlawful and unjustified conduct, in a just and reasonable amount in conformity with the evidence at trial;

(c)     punitive damages against each Defendant to the extent allowable by law;

(d)     reasonable attorneys' fees pursuant to 42 U. S. C. §§ 1988, N.Y. Executive Law § 297, and the New York City Administrative Code, Section 8-502(f);

(e)     costs and disbursements of this action; and

(f)     such further relief as appears to the Court to be just and proper.

## JURY DEMAND

The plaintiffs demand a jury trial on all issues so triable.

Dated: New York, New York
      March 3, 2023

By: *s/Nathaniel B. Smith*

_____
Nathaniel B. Smith
225 Broadway – Suite 1901
New York, New York 10005
(212) 227-7062
natbsmith@gmail.com

John D. Lenoir
4603 Parkwood Road
Austin, Texas
(212) 335-0250
john.lenoir@lenoir-attorney.com