UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SERENE R. WRIGHT and JOSEPHINE DEJESUS,

                        Plaintiffs,

            -v-

ETHICAL CULTURE FIELDSTON SCHOOL, JESSICA
BAGBY, ROBERT CAIRO, NIGEL FURLONGE, AND
"JOHN AND JANE DOES,"

                        Defendants.

CIVIL ACTION NO. 23 Civ. 1874 (JPO) (SLC)

**REPORT AND RECOMMENDATION**

**SARAH L. CAVE**, United States Magistrate Judge.

**TO THE HONORABLE J. PAUL OETKEN**, United States District Judge:

## I. INTRODUCTION

Plaintiff Serene R. Wright, a former student at Ethical Culture Fieldston School ("ECFS"),

and her mother, Josephine DeJesus, assert discrimination and retaliation claims under federal,

New York State, and New York City laws against ECFS and certain of its employees (together,

"Defendants").  (See generally ECF No. 1).  This action is one of several pending before the

Honorable J. Paul Oetken in this District in which current and former students have asserted

similar claims against ECFS.  See, e.g., Emile v. Ethical Culture Fieldston Sch., No. 21 Civ. 3799

(JPO), 2023 WL 4763233 (S.D.N.Y. July 26, 2023) ("Emile I").[1]  Plaintiffs were initially represented

by Derek Sells, Esq. ("Sells") of The Cochran Firm ("TCF"), before Plaintiffs terminated and

---

[1] Internal citations and quotation marks are omitted from case citations unless otherwise indicated.

replaced Sells with Nathaniel B. Smith ("Smith"),[2] the attorney who filed Plaintiffs' Complaint and represented Plaintiffs during settlement conferences with the undersigned in the summer of 2024, which did not result in a resolution of Plaintiffs' claims against ECFS.  (ECF No. 1; ECF min. entries dated May 3, 2024, July 19, 2024, Aug. 19–20, 2024).

Now before the Court are (1) Defendants' motion to enforce a settlement agreement they contend Plaintiffs agreed to on June 16, 2022 (ECF No. 62 (the "Settlement Motion")); see ECF No. 63 at 5), and (2) TCF's motion to enforce a charging lien against Plaintiffs, (ECF No. 82 (the "Lien Motion," with the Settlement Motion, the "Motions")), which Judge Oetken has referred to the undersigned for this Report and Recommendation.  (ECF No. 94).  Following a hearing on the Motions on June 30, 2025 (ECF min. entry dated June 30, 2025 (the "Hearing")), we respectfully recommend that the Settlement Motion be DENIED and the Lien Motion be DENIED without prejudice.

## II.  BACKGROUND

### A.  Factual Background[3]

Because Plaintiffs' similarities to, and differences from, the actions involving other ECFS students are material to our analysis of the Motions, we recount them in some detail here.

---

[2] John David Lenoir, another sole practitioner, has also appeared with Smith on behalf of Plaintiffs, although Smith appears to have the lead counsel role.  (ECF No. 4; see ECF Nos. 18–19).  For simplicity, the Court refers to Lenoir and Smith together as Smith.

[3] The Court has considered: the Settlement Motion and exhibits annexed thereto (ECF Nos. 62–64-19); Plaintiffs' memorandum of law in opposition to the Settlement Motion and exhibits annexed thereto (ECF Nos. 80–80-7); Defendants' reply memorandum of law in support of the Settlement Motion (ECF No. 81); the Lien Motion and exhibits annexed thereto (ECF Nos. 82–84); Plaintiffs' memorandum of law in opposition to the Lien Motion and exhibits annexed thereto (ECF Nos. 95–95-3); and TCF's reply memorandum of law in support of the Lien Motion.  (ECF No. 97).  TCF objected to and sought to strike Plaintiffs' declarations (ECF Nos. 80-4; 80-5; 95-2; 95-3; see ECF Nos. 84 at 11–13; 97 at 9–10).  Following the Court's request at the Hearing (ECF No. 100), Plaintiffs resubmitted their declarations containing ink signatures in compliance with the Local Rules of this Court.  (ECF Nos. 101; 101-1; 101-2).  See SDNY Elec.

## 1. **The Emile Action**

In April 2021, TCF filed a complaint on behalf of another ECFS student asserting claims of race discrimination against ECFS. (Complaint, <u>Emile v. Ethical Culture Fieldston Sch.</u>, No. 21 Civ. 3799 (JPO) (S.D.N.Y.) (the "Emile Action"), ECF No. 1). The Emile Action was stayed pending mediation between October 2021 and January 2022. (Emile Action, ECF Nos. 33–36).

In July 2022, following a year of document discovery, and on the eve of one of the plaintiffs' depositions, the parties in the Emile Action "reached a settlement in principle which was memorialized in an email chain[,]" (the "Emile Settlement"), as a result of which the parties adjourned the deposition and "suspended further discovery." <u>Emile I</u>, 2023 WL 4763233, at *1–2. In the July 31, 2022 email chain, ECFS indicated that the written agreement would "incorporate both non-disparagement and confidentiality provisions[,]" to which Sells responded, "This is our understanding. We have an agreement on the terms you detailed below." <u>Id.</u> at *2. Counsel for the parties exchanged drafts of a written agreement, but the Emile plaintiffs "refused to sign [it,]" terminated TCF, and retained Smith to represent them. <u>Emile v. Ethical Culture Fieldston Sch.</u>, No. 21 Civ. 3799 (JPO), 2024 WL 1216473, at *1 (S.D.N.Y. Mar. 21, 2024) ("<u>Emile II</u>").

On November 15, 2022, Smith appeared for the plaintiffs in the Emile Action, and the same day, alleging that the plaintiffs had "attempt[ed] to renege" on the Emile Settlement, ECFS moved to enforce it. (Emile Action, ECF No. 75 at 5). On July 26, 2023, Judge Oetken granted

---

Case Filing Rules & Instr. No. 8.4, available at https://nysd.uscourts.gov/sites/default/files/pdf/ecf_rules/ECF%20Rules%2020230724%20TH%20FINAL%203.pdf (last visited July 2, 2025). Accordingly, TCF's request to strike Plaintiffs' declarations is denied as moot.

ECFS's motion to enforce, finding that, as of July 31, 2022, the parties had reached an agreement in principle on the material terms of the Emile Settlement, i.e., the amount ECFS would pay to the plaintiffs, the plaintiffs' release of their claims against ECFS, and confidentiality and non-disparagement.  Emile I, 2023 WL 4763233, at *1–2.

The parties' understanding as to confidentiality and non-disparagement subsequently fell apart, following which Judge Oetken had to "determine the specific language of the confidentiality and non-disparagement terms of the" Emile Settlement.  Emile II, 2024 WL 1216473, at *1.  In addition, Judge Oetken granted TCF's motion to enforce a charging lien against the Emile Settlement, holding that "the parties reached a settlement on July 31, 2022" such that "[t]he 40% contingency fee fixed in the retainer agreement [was] dispositive in determining the amount of the fee owed to TCF."  Id. at *4.

### 2.  The Mason Action

Madison Mason, a former student of color at ECFS, alleged that ECFS did not provide her "with the same opportunities and benefits that were provided to white students and [that she] was in fact discriminated against because of her race and color."  (Mason v. Ethical Culture Fieldston Sch., No. 23 Civ. 1402 (JPO) (SLC) (the "Mason Action"), ECF No. 4 ¶ 10); see Mason Action, ECF Nos. 4 ¶¶ 1, 9; 84-1 ¶ 2; 84-2 ¶ 2).  TCF drafted and sent to ECFS's counsel a class action complaint, in which Madison Mason, and her mother, Jenine Mason (the "Masons"), were among ten named plaintiffs, asserting race discrimination claims under federal, New York State, and New York City law against ECFS.  (Mason Action, ECF Nos. 77-3 (the "Draft Class Complaint"); 77-4 at 1; 84-1 ¶ 1; 84-2 ¶ 1).

On behalf of the Masons, Sells engaged in settlement negotiations with ECFS (see Mason Action, ECF No. 77-5 at 6), but the Masons claimed that Sells did not inform them of ECFS's initial offer, that his fees would be deducted from that amount, or about "any of the progress or issues of the settlement negotiations."  (Mason Action, ECF No. 84-1 ¶¶ 10–13; see Mason Action, ECF No. 84-2 ¶¶ 9–10).  Sells did inform Madison that any settlement "would need to be kept confidential."  (Mason Action, ECF No. 77-5 at 34–35).  On June 16, 2022, Sells informed Madison that ECFS had offered to pay approximately twice what he had initially represented to the Masons he "thought he could get[,]" an amount that would be reduced by TCF's 40% contingency fee. (Mason Action, ECF No. 84-1 ¶¶ 4, 10, 12).  Madison described this as "amazing news" and thanked Sells for "everything [he had] done to make sure [her] voice was heard."  (Mason Action, ECF No. 77-5 at 37).  That same day, Sells sent an email to ECFS's counsel stating that the Masons had accepted ECFS's "last and final offer[.]"  (Mason Action, ECF No. 77-10 at 2).  In an exchange on July 10, 2022, Madison acknowledged that Sells had told her the amount that she would receive after he deducted his fee.  (Mason Action, ECF No. 77-5 at 6, 37–38).

The initial draft settlement agreement template that ECFS's counsel prepared and circulated on June 26, 2022 contained a confidentiality, but not a non-disparagement, provision, and defined the "Effective Date" as "the date the Parties fully execute the Agreement."  (Mason Action, ECF No. 84-5 at 7–14 (the "June 26 Draft")).  The confidentiality provision in the June 26 Draft appeared as follows:

4. **Confidentiality**

The parties and their counsel agree that the terms and conditions of this Agreement, including the fact that the Parties entered into this Agreement; all facts, information, evidence, and details about the dispute, and all other aspects of settlement discussions and/or negotiations between the Parties, are

confidential and shall not be disclosed or revealed by them or their counsel, except as specified below.  The Parties and their counsel specifically agree that they will not publish or otherwise publicly transmit ay information in any form, including a press release, statement, or other information about the Agreement, the terms of the Agreement, or any details of the dispute and/or Threatened Action, including but not limited to all aspects described herein, to the media, or to any individual or organization.

The Parties agree that this Confidentiality provision is a material term of the Agreement.  Any breach of this Confidentiality provision shall entitle the non-breaching party to damages and attorney's fees as determined by a neutral arbitrator in confidential binding mediation . . . .  In addition, in the event of a breach by Complainants as determined by the arbitrator, Complainants shall return the Settlement Consideration[.]

. . .

Complainants agree that, to the maximum extent permitted by law, Complainants will not encourage or voluntarily assist or aid in any way any non-governmental attorneys or their clients or individuals acting on their own behalf in making, filing, prosecuting, or defending any lawsuits, complaints, or other proceedings involving ECFS or ECFS Related Persons, and represent that Complainants have not previously engaged in such conduct. . . .

(Mason Action, ECF No. 84-5 at 9–10 (the "June 26 Confidentiality Provision")).  The June 26 Confidentiality Provision also listed to whom and when the terms and conditions of the Agreement could be disclosed, defined the term "publicly disclosed," and required written notice in the event of a legal request for disclosure, such as a subpoena.  (Id.).  Over the summer, Sells and ECFS's counsel exchanged comments on the Masons' June 26 Draft, including as to the June 26 Confidentiality Provision, but non-disparagement was not mentioned.  (Id. at 25–44).

On September 2, 2022, ECFS's counsel sent Sells "execution versions" of the Masons' settlement agreement, which now contained a non-disparagement provision.  (Id. at 47–55 (the "Sept. 2 Draft"); see Mason Action, ECF Nos. 77-4; 77-9; 77-11).  The new provision was renamed "Confidentiality and Non-Disparagement" and added to the June 26 Confidentiality Provision the following:

6

> Complainants agree that they will not at any time make, publish, or communicate to any person or entity, any Disparaging (as defined below) remarks, comments, or statements concerning ECFS or ECFS Related Persons, including, without limitation, by way of the Internet, social media, or otherwise (including but not limited to, Facebook, Twitter, or LinkedIn).  For purposes of this Agreement, "Disparaging" remarks, comments, or statements are those that tend to impugn the character, physical or mental condition, honesty, integrity, morality, business acumen, or abilities of the individual or entity being disparaged.

(Mason Action, ECF No. 84-5 at 50 (the "Sept. 2 Confidentiality and Non-Disparagement Provision")).  The Sept. 2 Confidentiality and Non-Disparagement Provision also modified the penalty provision as follows:

> The Parties agree that this Confidentiality <u>and Non-Disparagement</u> provision is a material term of the Agreement.  Any breach of this Confidentiality <u>and Non-Disparagement</u> provision shall entitle the non-breaching party to damages and attorney's fees as determined by a neutral arbitrator in confidential binding mediation . . . In addition, in the event of a breach by Complainants as determined by the arbitrator, Complainants shall return <u>[a portion] of</u> their Settlement Consideration . . .

(<u>Id.</u> at 51 (underlined to indicate revisions)).

The same day, Sells shared with Madison the Sept. 2 Draft, which reflected the deduction of TCF's 40% contingency fee from the settlement amount and, as she observed, "for the first time, mentioned that [she] would have to agree to non-disparagement conditions as part of the agreement."  (Mason Action, ECF No. 84-1 ¶ 15; <u>see</u> Mason Action, ECF Nos. 84-2 ¶ 11; 84-6 at 2 (Sept. 2, 2022 email from Sells stating that agreement "requires you and your mom to keep the [agreement confidential] and to not say negative things about [ECFS] or any of its employees.")).  Madison attested that Sells "never discussed with [her] the meaning of non-disparagement, nor did he ever explain the penalties . . . or the other arbitration and legal fee enforcement provisions in the draft agreement if the school felt [she] had violated these provisions."  (Mason Action, ECF No. 84-1 ¶ 15).

"[I]n [] September 2022," Madison heard from other plaintiffs that they "believed that []
Sells was being evasive and strange with them about how much each family and student would
receive from the settlement and the nature and scope of his settlement negotiations with
[ECFS]." (Mason Action, ECF No. 84-1 ¶ 15). The Masons "came to believe that [] Sells was
not being fully truthful about how he was representing" them. (Id.; see Mason Action,
ECF No. 84-2 ¶ 14). After becoming "suspicious" and "fearful" of Sells, Madison "made it clear
to him that [she] did not agree to the terms of the proposed settlement agreement[,] would not
sign it and [] stopped communicating with him." (Mason Action, ECF No. 84-1 ¶ 16). In
February 2023, the Masons engaged Smith and terminated Sells. (Id. ¶ 17; Mason Action, ECF
No. 84-2 ¶ 15).

On February 20, 2023, the Masons, represented by Smith, filed the Complaint. (Mason
Action, ECF No. 4). ECFS filed a "motion to enforce settlement agreement[,]" but at the Plaintiffs'
request, Judge Oetken stayed the action. (Mason Action, ECF Nos. 29–33, 41). The stay remained
in place until April 2024 when, at the parties' request, Judge Oetken lifted the stay and
referred the action to the undersigned to conduct a settlement conference. (Mason Action,
ECF Nos. 45–46; Mason Action ECF min. entry dated Apr. 12, 2024).

Over the summer of 2024, the Court held telephone conferences and two in-person
settlement conferences, at the last of which the Masons and ECFS reached a settlement (the
"Mason Settlement"). (Mason Action, ECF min. entries dated May 3, 2024, July 19, 2024,
July 22, 2024 & Sept. 9, 2024). On September 12, 2024, Judge Oetken dismissed the Mason
Action without prejudice to any application to reopen it within 30 days. (Mason Action, ECF
No. 63).

On October 4, 2024, TCF asked Judge Oetken to reopen the Mason Action to assert a charging lien against the Mason Settlement, which Judge Oetken denied, but, with the parties' consent, referred the question of TCF's charging lien to the undersigned for a report and recommendation.  (Mason Action, ECF Nos. 65; 71; 74; 75).  On January 24, 2025, after briefing and argument, the Court issued a report and recommendation recommending that TCF be granted a charging lien against the Mason Settlement, not in the amount of the 40% contingency fee, but in the quantum meruit amount of $48,957.50.  (Mason Action, ECF No. 102 (the "Mason R&R")).  On July 7, 2025, the Honorable J. Paul Oetken adopted the Mason R&R in its entirety. Mason v. Ethical Culture Fieldston Sch., No. 23 Civ. 1402 (JPO), 2025 WL 1862829 (S.D.N.Y. July 7, 2025).

### 3.  This Action

Wright was a student of color at ECFS from September 2017 until her graduation in June 2021.  (ECF Nos. 1 ¶¶ 1, 12; 101-2 ¶ 2).  In May 2021, DeJesus met Sells, who was preparing a discrimination lawsuit against ECFS and offered to represent her and her daughter. (ECF Nos. 101-1 ¶ 4; 101-2 ¶ 6).  On May 4, 2021, Plaintiffs executed retainer agreements, which provided that TCF was entitled to a 40% fee "contingent upon our obtaining a settlement or judgment on [their] behalf[,]" and that TCF would "receive no attorneys' fees" if it did not "obtain a settlement or judgment[.]"  (ECF No. 83-4 at 2, 4).

On May 18, 2021, Sells sent to ECFS's counsel a draft complaint alleging that ECFS subjected Wright to a racially discriminatory educational environment and asserting on behalf of Plaintiffs race discrimination and retaliation claims under federal, New York State, and New York

City law. (ECF No. 83-5). Plaintiffs were also included in the Draft Class Complaint that Sells sent to ECFS's counsel on April 29, 2022. (ECF Nos. 64-1; 83-6).

Sells offered to negotiate a settlement on behalf of Plaintiffs, who informed Sells on June 16, 2022 that their "bottom" line was ███████[4] to be divided between DeJesus and Wright. (ECF No. 80-2 at 1–3 (the "June 16 Text"); see ECF Nos. 101-1 ¶¶ 7-8; 101-2 ¶ 8). Sells informed DeJesus that he "thought he could get" them ███████, "but that his [40%] fee would have to be deducted" and Plaintiffs would divide the remainder, ███████, between themselves. (ECF No. 101-1 ¶ 9). DeJesus told Sells that she was "comfortable" dividing the remainder two-thirds for Wright and one-third for herself. (Id.; ECF Nos. 80-2 at 3; 101-1 ¶ 9; 101-2 ¶ 9). DeJesus believed "that these brief discussions were only an initial or preliminary conversation about the possibility of a settlement with [ECFS,]" and did not understand that she "was making a binding or legal commitment on those numbers." (ECF No. 101-1 ¶ 9). "[A]t that point"—in June 2022—Sells "never told [her] that [she] was entering into a binding commitment . . . to settle [their] claims." (Id.) "[O]ther than a very vague reference to an 'NDA' or an agreement to keep the settlement confidential," Sells did not explain to DeJesus "any other terms and conditions for accepting money" in a settlement. (Id. ¶ 10). After June 16, 2022, DeJesus "did not hear again from [] Sells for several weeks." (Id. ¶ 11).

Also on June 16, 2022, Sells notified ECFS's counsel that all of his "clients named in the [Draft Class Complaint]"—i.e., including Plaintiffs—have accepted [ECFS's] last and final offer" of

---

[4] As in Emile I, the parties' demands and offers are "not directly relevant to the determination of whether the parties reached a binding agreement." Emile I, 2023 WL 4763233, at *1 n.1. In addition, the privacy interests in maintaining the confidentiality of the parties' settlement positions are strong, given ECFS's desire for a confidentiality provision, and, in any event, the parties' privacy interests outweigh the public interest in access to these numbers. See id.

the global amount of ███████ and invited a discussion of "the settlement agreements and other details." (ECF Nos. 64-2 at 2; 77-2 at 2). On June 26, 2022, ECFS's counsel sent to Sells the June 26 Draft, which, as noted above, contained a confidentiality—but not a non-disparagement—provision, and defined the "Effective Date" as "the date the Parties fully execute the Agreement." (ECF No. 64-4 at 2–4; see ECF Nos. 64-3 (transmittal email); 77-3 (noting that June 26 Draft for Wright was to be a template for other plaintiffs)). On June 27, 2022, Sells provided "our edits" to the June 26 Draft and specified the amount that "each of the ECFS families we represent will receive[.]" (ECF No. 64-5 at 2; see ECF No. 64-6 (Sells' edits)). As noted above, over the summer, Sells and ECFS's counsel exchanged comments on the June 26 Draft, including as to the June 26 Confidentiality Provision, but non-disparagement was not mentioned in their email exchanges. (ECF Nos. 64-7; 64-8; 64-9; 64-10; 64-11; 64-12; 103 at 8). At one point, Sells threatened that if he did not receive revised agreements, he would "file suit to compel the settlement[.]" (ECF No. 64-12). DeJesus did not give Sells "the authority to make such a threat or bring a lawsuit on [her] behalf." (ECF No. 101-1 ¶ 17).

In August 2022, DeJesus texted Sells "to inquire as to the status of the matter." (ECF No. 101-1 ¶ 12). On August 19, 2022, DeJesus informed Sells that she and Wright were "declining [ECFS's] offer and [we]re strongly entertaining the thought of taking this all the way to tr[ia]l." (ECF No. 80-2 at 9; see ECF No. 101-1 ¶ 13). The same day, Sells responded that he was "away" but would call DeJesus on his return. (ECF No. 80-2 at 10). There do not appear to be any communications between Sells and DeJesus until September 2, 2022. (Id. at 10–15).

On September 2, 2022, ECFS's counsel sent Sells the Sept. 2 Draft—which contained the Sept. 2 Confidentiality and Non-Disparagement Provision—as the "execution version" for

Plaintiffs to sign. (ECF Nos. 64-13; 64-14; 83-8). It is undisputed that the Sept. 2 Draft was the first to contain the Sept. 2 Confidentiality and Non-Disparagement Provision. (ECF Nos. 63 at 18; 97 at 6). Although he had not yet discussed the Sept. 2 Draft with Plaintiffs (ECF No. 80-2 at 11), Sells responded with a proposed edit to the amount of liquidated damages his clients would be required to pay if they breached the Sept. Confidentiality and Non-Disparagement Provision. (ECF No. 64-15 at 3). ECFS agreed to make Sells' edit as to Plaintiffs with two modifications that are not material to our analysis. (ECF No. 64-16 at 2).[5]

Later on September 2, 2022, Sells sent a text message to DeJesus stating that he had tried to call her and was "sending" her the Sept. 2 Draft "and associated documents that [she] will need to fill out." (ECF No. 80-2 at 11–13; see ECF No. 101-1 ¶ 14). DeJesus attests that this was "the first time [Sells] mentioned or tried to explain" non-disparagement and confidentiality. (ECF No. 101-1 ¶ 14). DeJesus responded, "I am a bit confused [because] I made it perfectly clear that we w[]ere not agreeing to this settlement that was offered[,]" noting that Sells had not called her as he said he would in his August 19 message. (ECF No. 80-2 at 15). Sells told DeJesus, "you already agreed back in June and we have a deal with [ECFS,]" referencing the June 16 Text, which he said "made a binding agreement." (ECF No. 80-2 at 16–17). Sells added that he "got" Plaintiffs ███████, which was higher than their "bottom line[,]" and asserted that, "[a] deal is a deal." (ECF No. 80-2 at 18). DeJesus responded, "[w]e will discuss when I get back[.]" Sells followed up a few days later, but no response from DeJesus appears in the record. (ECF No. 80-2 at 20).

When, on September 14, 2022, ECFS's counsel inquired about the status of the Sept. 2 Draft, Sells told ECFS's counsel that he would "follow up[,]" but did not mention that DeJesus had

---

[5] ECFS rejected Sells edit as to the Masons and another student. (ECF No. 64-16).

told him Plaintiffs were rejecting ECFS's offer.  (ECF No. 64-17 at 2).  On September 19, 2022, Sells told ECFS's counsel that "[o]ur clients"—presumably including Plaintiffs—were "reviewing" the Sept. 2 Draft, but again, did not mention Plaintiffs' decision to reject ECFS's offer.  (ECF No. 64-18 at 2).

Plaintiffs "came to realize that [] Sells was not being fully truthful about how he was representing [them]."  (ECF No. 101-1 ¶ 19).  Although DeJesus authorized Sells to negotiate with ECFS, she "expected that [she] would be afforded the opportunity to consider the full ramifications of any settlement . . . , make a considered and informed decision on the amount of money [she] would accept[,]" and would not be "bound until [she] signed a written agreement."  (ECF No. 101-1 ¶ 19).  In January 2023, Plaintiffs terminated Sells and engaged Smith.  (ECF Nos. 101-1 ¶ 20; 101-2 ¶ 16).

On March 3, 2023, Plaintiffs, represented by Smith, filed the Complaint, which contains race discrimination allegations and claims similar to the Mason Action.  (See generally ECF No. 1).  On March 15, 2023, Smith sent an email to Plaintiffs, copying Sells, regarding a possible media article about the Complaint, expressing concern about ECFS's reaction, and stating that "Sells had already 'agreed' to keep the matters confidential."  (ECF No. 83-3 at 2).

During his representation of Plaintiffs from April 2021 to January 2023, Sells recorded 68.85 hours on the matter at an hourly rate of $1,250.  (ECF No. 83-9 at 6).  Mina Q. Malik ("Malik"), another TCF partner, recorded 40.85 hours on Plaintiffs' matter at an hourly rate of $1,000.  (ECF No. 83-10).  In identical entries on June 2, 2022, Sells and Malik both recorded that they "[a]pproved non-monetary conditions relating to confidentiality and non-disparagement."  (ECF No. 83-9 at 5).  Neither of their billing records reflect a discussion with Plaintiffs about those

provisions, but they do corroborate DeJesus' statement that Sells did not communicate with her between June 19, 2022 and August 10, 2022 (ECF No. 101-1 ¶¶ 12–13), and that she informed Sells on August 19, 2022 that Plaintiffs decided not to accept ECFS's settlement offer. (ECF Nos. 83-9 at 5; 101-1 ¶ 13).

### III.DISCUSSION

#### A. Settlement Motion

##### 1. Legal Standard

As Judge Oetken noted in Emile I, "a 'district court has the power, and indeed the duty, to enforce summarily, on motion, a settlement agreement reached in a case pending before it.'" 2023 WL 4763233, at *1 (quoting Lindner v. Am. Express Corp., No. 06 Civ. 3834 (JGK), 2007 WL 1623119, at *3 (S.D.N.Y. June 5, 2007)). "The principles for determining whether to enforce a settlement agreement are set forth in the Second Circuit's decisions in Murphy v. Inst. of Int'l Educ. 32 F.4th 146 (2d Cir. 2022), and Winston v. Mediafare Entertainment Corp., 777 F.2d 78 (2d Cir. 1985)." Emile I, 2023 WL 4763233, at *1. Settlement agreements are contracts to be construed according to contract law principles. See Murphy, 32 F.4th at 150. A "Type I" preliminary contract exists "when the parties have reached complete agreement (including the agreement to be bound) on all the issues perceived to require negotiation." Id. Under Winston, a court must consider the following four factors to determine whether a Type I agreement exists: "(1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing." 777 F.2d at 80.

The <u>Winston</u> factors are "helpful," <u>Emile I</u>, 2023 WL 4763233, at *1, but are not a "talismanic scorecard." <u>Murphy</u>, 32 F.4th at 151. Instead, "the ultimate issue, as always, is the intent of the parties: whether the parties intended to be bound, and if so, to what extent." <u>Id.</u>

### 2. **Application**

Applying the <u>Winston</u> factors, and after considering the entire record in this case[6] and this Court's experience presiding over two settlement conferences in this action, we conclude that no enforceable settlement was reached between Plaintiffs and ECFS during the time that TCF represented Plaintiffs.[7]

### a. **First Winston Factor**

Both the June 26 Draft and the Sept. 2 Draft contemplated that the parties' agreement would not be "[e]ffective" until "the Parties fully execute[d]" the document. (ECF Nos. 64-4 at 2; 64-14 at 2). "Courts in the Second Circuit have placed great importance on the language in the written agreement itself as evidence of the parties' implied reservations not to be bound until the execution of a written agreement." <u>In re Motors Liquidation Co.</u>, 580 B.R. 319, 345 (Bankr. S.D.N.Y. 2018); <u>see</u> <u>Ciaramella v. Reader's Dig. Ass'n, Inc.</u>, 131 F.3d 320, 324 (2d Cir. 1997) (concluding that references to "effective date" indicated that "parties did not intend to bind themselves until the settlement had been signed"); <u>In re Diocese of Rochester</u>, 664 B.R. 378, 391–

---

[6] In their opposition to the Settlement Motion, Plaintiffs complain that they "do not have all the communications" between Sells and ECFS's counsel or documents from ECFS about the alleged settlement, and so ask the Court to "defer considering the motion and allow [them] time to take discovery." (ECF No. 80 at 29). Because, as set forth below and in the Mason R&R, we have sufficient information in the record to resolve the factual and legal issues in the Motions, no discovery is necessary, and we respectfully recommend that Plaintiffs' request for discovery be DENIED.

[7] In the Lien Motion, TCF joins ECFS's arguments in support of finding that a settlement arose between Plaintiffs and ECFS, so we focus our attention on ECFS's arguments. (ECF No. 84 at 8).

92 (Bankr. W.D.N.Y. 2024) (same).  Indeed, Judge Oetken has agreed that the use of "executed" in the June 26 and Sept. 2 Drafts "means signed," and therefore supports that the parties did not intend to be bound until an agreement was signed.  Mason, 2025 WL 1862829, at *2.

In addition, in the Sept. 2 Draft, ECFS conditioned its payment of the settlement amount to Plaintiffs on receipt of "a fully executed [A]greement" and other documents, as well as Plaintiffs' agreement to release their claims and to the confidentiality and non-disparagement provisions.  (ECF No. 64-14 at 3).  This provision also supports the conclusion that the parties "did not intend to be bound by the agreement until it was fully executed[,]" because ECFS was allowed to—and in fact did—withhold "payment absent a signed agreement."  Chepilko v. CIGNA Grp. Ins., No. 08 Civ. 4033 (JGK) (RLE), 2011 WL 13263166, at *3 (S.D.N.Y. Feb. 2, 2011), adopted by, 2011 WL 13263170 (S.D.N.Y. Mar. 2, 2011).  Plaintiffs are therefore analogous to the Masons, and distinguishable from Emile I, where the parties had not prepared and exchanged a draft agreement containing an execution provision, but rather had "memorialized in an email chain" dated July 31, 2022 "[a]ll the material terms" of the settlement that Judge Oetken found were enforceable.  Emile I, 2023 WL 4763233, at *1–2.

ECFS points to Sells' emails in the summer of 2022 as well as the decision in Emile I as support for the conclusion that the parties had reached a settlement in June 2022.  (ECF No. 63 at 14–16).  But none of the emails between ECFS's counsel and Sells before September 2, 2022 reference non-disparagement, let alone contain confirmation that any "agreement will incorporate both non-disparagement and confidentiality provisions[,]" as was the case in the July 31, 2022 email that Judge Oetken found provided confirmation of the existence of an agreement in Emile I.  2023 WL 4763233, at *1 (emphasis added).  In addition, Sells' June 16,

2022 email to ECFS's counsel only indicated overall acceptance of a monetary number for all his "clients named in the proposed class action suit[,]" and did not contain a breakdown of what each family would receive or reference confidentiality and non-disparagement.  (ECF No. 64-2 at 2).  While Sells' June 27, 2022 email provided a breakdown of the amount each of the families was to receive, again, the correspondence discussed the monetary amount, but did not mention non-disparagement.  (ECF No. 64-10 at 2–3).  Indeed, ECFS's counsel has conceded that their correspondence with Sells before September 2, 2022 did not reference non-disparagement.  (ECF No. 103 at 8).  ECFS's argument that the June 26 Confidentiality Provision provided "in effect . . . most" of what the Sept. 2 Confidentiality and Non-Disparagement Provision contains (id. at 17) similarly represents a concession that there are material differences between those two provisions, as is apparent from their face—the latter being substantially more restrictive on Plaintiffs than the former.  (See § II.A.2, supra).  As Plaintiffs attest—and Sells' billing records do not refute—Sells did not discuss the non-disparagement provision with them in June 2022, so Plaintiffs could not have yet agreed to that provision.  (ECF Nos. 83-9 at 5; 101-1 ¶ 14; 101-2 ¶ 11).

Given these circumstances, the primary case on which ECFS relies (ECF No. 63 at 16), is distinguishable because the record here does not show that an "agreement had been reached before the drafts formalizing the settlement were exchanged."  In re Lehman Bros. Holdings Inc., No. 17 Civ. 03424 (DLC), 2017 WL 3278933, at *3 (S.D.N.Y. Aug. 2, 2017), aff'd, 739 F. App'x 55 (2d Cir. 2018) (summary order).  Because Sells' emails only confirm Plaintiffs' acceptance of a monetary amount, but not a non-disparagement provision, the first Winston factor supports the finding that as of June 2022, the parties had not yet entered into a complete, binding settlement

agreement.  See Ciaramella, 131 F.3d 320, at 321 (finding that, even though parties had "an agreement in principle to settle," language in draft agreements indicated that they "did not intend to bind themselves until the settlement had been signed").

### b. Second Winston Factor

"The second Winston factor considers whether one party has partially performed, and whether that performance has been accepted by the party disclaiming the existence of an agreement." Jericho Grp. Ltd. v. Mid-Town Dev. Ltd. P'ship, No. 14 Civ. 2329 (DLI) (VMS), 2016 WL 11263660, at *8 (E.D.N.Y. Dec. 5, 2016) (citing Ciaramella, 131 F.3d at 325), adopted by, 2017 WL 4221068 (E.D.N.Y. Sept. 22, 2017).  This factor has "the least sway" in our analysis.  Walker v. City of N.Y., No. 05 Civ. 0004 (JBW) (JMA), 2006 WL 1662702, at *8 (E.D.N.Y. June 15, 2016).

As an initial matter, because Plaintiffs are the party arguing that no settlement existed, the question is whether ECFS "partially performed under the agreement, and whether that performance was accepted by Plaintiffs." Jericho Grp., 2016 WL 11263660, at *8.  Accordingly, ECFS's reliance on the fact that "Plaintiffs took no further action on their claims until nearly a year later when they filed this suit" is misplaced.  (ECF No. 63 at 17).  The fact that ECFS prepared the June 26 and Sept. 2 Drafts does weigh "slightly" in favor of ECFS.  Samuel v. Bd. of Educ. of N.Y.C., No. 12 Civ. 4219 (ENV) (LB), 2015 WL 10791896, at *4 (E.D.N.Y. Aug. 11, 2015), aff'd sub nom. Samuel v. N.Y.C. Bd. of Educ., 668 F. App'x 381 (2d Cir. 2016).  Unlike Emile I, however, where "the parties immediately ceased discovery on the eve of Plaintiffs' depositions in reliance on the settlement[,]" there was no litigation already underway that came to a halt as a result of the parties' discussions in June 2022.  Emile I, 2023 WL 4763233, at *2; see Mason, 2025 WL 1862829, at *2 (noting that "parties took no steps to partially perform the agreement once it was

allegedly executed"). In any event, Plaintiffs ultimately did publicly file the Complaint, in which Wright described her experiences at ECFS. (ECF No. 1). Furthermore, ECFS has not made any settlement payment to Plaintiffs, and they have not released their claims against ECFS, two of the basic elements of consideration the parties were to exchange as set forth in the June 26 and Sept. 2 Drafts. (ECF Nos. 64-4 at 2–3; 64-14 at 2–3).

While ECFS's preparation of the June 26 and Sept. 2 Drafts leans slightly in favor of enforcement, on balance the second Winston factor weighs neither strongly for or against enforcement. See Walker, 2006 WL 1662702, at *8 (finding that parties' non-pursuit of litigation was neutral as to second Winston factor).

### c. Third Winston Factor

The Court's review of the record and experience speaking with Plaintiffs during two settlement conferences in this action compels the conclusion that, as of June 2022, Plaintiffs and ECFS had not agreed on all material terms of a settlement. As noted above and as in the Mason Action, a non-disparagement provision did not appear in the June 26 Draft, Sells' billing records do not reflect that he raised that provision with them any time before September 2, 2022, and Sells' emails with ECFS's counsel before September 2, 2022 do not mention that term. (ECF Nos. 64-2; 64-3; 64-4; 64-5; 64-7; 64-8; 64-9; 64-10; 64-11; 64-12; 83-9). See Mason, 2025 WL 1862829, at *2 (noting that "material terms" including non-disparagement were added in Sept. 2 Draft). Sells also admits that the June 26 Draft did not contain a non-disparagement provision, (ECF No. 97 at 6), and ECFS's counsel acknowledged that it was not mentioned in their correspondence with Sells before September 2, 2022. (ECF No. 103 at 8). While Sells and ECFS's counsel discussed the liquidated damages provision, it was only in the context of a breach of "the

confidentiality provision[.]" (ECF No. 64-7). ECFS acknowledges as much when it asserts that, by June 27, 2022, Sells "had confirmed . . . [that] Plaintiffs had agreed to the inclusion of a confidentiality provision with a liquidated damages penalty in the event of a breach by Plaintiffs." (ECF No. 63 at 18). ECFS's omission of any reference to the Sept. 2 Confidentiality and Non-Disparagement Provision in that sentence is a concession that, as of June 16, 2022—the date that ECFS professes "settled this case" (id. at 5)—Plaintiffs had not agreed to that term.

Given the timeline apparent from the record, Sells' and Malik's billing entries showing that they told ECFS's counsel on June 2, 2022 that they "[a]pproved" the non-disparagement provision are not credible. (ECF Nos. 83-9 at 5; 83-10 at 5–6). As we noted in the Mason R&R (Mason Action, ECF No. 102 at 11), even in the Emile Action, the non-disparagement term was not agreed on until July 31, 2022, see Emile I, 2023 WL 4763233, at *2, weeks after Sells and Malik claim to have told ECFS's counsel they "approved" that term. (ECF Nos. 83-9 at 5; 83-10 at 5–6). Having observed Plaintiffs in two settlement conferences and Sells' demeanor in this and the Mason Action, we find Plaintiffs' attestations more credible and discount Sells' and Malik's billing entries. Because the parties had not agreed on all material terms while TCF represented Plaintiffs, the third Winston factor weighs against finding that a settlement agreement existed as of June 16, 2022.

### d. Fourth Winston Factor

"There is no question that the settlement agreement between the parties is the type that is usually committed to writing." In re Diocese of Rochester, 664 B.R. at 393. Both the June 26 and Sept. 2 Drafts were not simplistic: each were seven pages long and contained multiple sections and defined terms. (ECF Nos. 64-4; 64-14). The June 26 Confidentiality Provision spans

two pages, and the Sept. 2 Confidentiality and Non-Disparagement Provision expanded to a third page.  (ECF Nos. 64-4 at 3–4; 64-14 at 3–5).  The June 26 and Sept. 2 Drafts were also governed by New York law, which requires that an agreement to settle litigation in the state must be on the record in open court or reduced to a signed written agreement.  N.Y. C.P.L.R. § 2104.  While the Second Circuit has not ruled that this provision is applicable to federal courts sitting in New York, district courts have deemed the provision "at least relevant in applying the fourth <u>Winston</u> factor."  <u>In re Diocese of Rochester</u>, 664 B.R. at 393.  In short, while the existence of the June 26 and Sept. 2 Drafts could support finding an enforceable agreement, <u>see id.</u> at 393–94, the fact that the Sept. 2 Draft was not finalized and executed while TCF represented Plaintiffs "tends to weigh against enforcement in the <u>Winston</u> analysis."  <u>Emile I</u>, 2023 WL 4763233, at *3.  Either way, courts have given the fourth factor less weight as compared to the other <u>Winston</u> factors. <u>See id.</u> (giving fourth factor "relatively little weight"); <u>In re Diocese of Rochester</u>, 664 B.R. at 394 (noting that fourth <u>Winston</u> factor was "entitled to little weight").

Accordingly, the fourth <u>Winston</u> factor does not strongly weigh in favor of or against finding an agreement.

*       *       *

On balance, the application of the <u>Winston</u> factors weighs against finding that Plaintiffs and ECFS reached an enforceable settlement agreement in June 2022 or at any other time while TCF represented Plaintiffs.  The first and third factors weigh against finding an enforceable agreement, the second factor, which has the least force, only weighs slightly in favor, and the fourth is neutral.  We find that it was "not enough" that any agreement on the monetary amount in June 2022 was reduced to the June 26 and Sept. 2 Drafts, which, by their "plain and express

terms [were] not effective unless and until [they were] signed by all parties[,]" and that "never happened."  In re Diocese of Rochester, 664 B.R. at 394.  In other words, full execution was "a condition precedent to the formation of an enforceable contract—and it never occurred."  Id. Based on our conclusion that no enforceable settlement was reached while TCF represented Plaintiffs, we respectfully recommend that the Settlement Motion be denied.

## B.  **Lien Motion**

Because Plaintiffs and ECFS did not reach an enforceable settlement before Plaintiffs discharged TCF, Plaintiffs' claims remain pending and this litigation must continue.  In the first instance, then, we respectfully recommend denial of the Lien Motion without prejudice, because "in the normal case[,]" courts "defer determination of the fees and disbursements due the [withdrawing] attorney until the resolution of the main case to avoid injecting side issues . . ." Misek-Falkoff v. Int'l Bus. Mach. Corp., 829 F. Supp. 660, 663 (S.D.N.Y. 1993).[8]  In the event that Judge Oetken were to disagree with our recommendation as to the Settlement Motion, for completeness we analyze the Lien Motion to determine whether and to what extent TCF would be entitled to any charging lien against Plaintiffs' recovery in this action.

### 1.  **TCF's Entitlement to a Charging Lien**

#### a.  **Legal Standard**

A federal court "may, in its discretion, exercise ancillary jurisdiction to hear fee disputes . . . between litigants and their attorneys when the dispute relates to the main action[.]" Chesley v. Union Carbide Corp., 927 F.2d 60, 64 (2d Cir. 1991); see 28 U.S.C. § 1367.  In an action

---

[8] Plaintiffs' first argument in opposition to the Lien Motion is that it is premature because no settlement has been "consummated[,]" (ECF No. 95 at 5–6), which we have addressed in III.A, supra.

such as this, involving a federal statute with a fee-shifting provision, "the matter of attorney's fees becomes part of an inextricable whole." Misek-Falkoff., 829 F. Supp. at 663.  Here, the Masons' claim under 42 U.S.C. § 1981 included a request to recover attorneys' fees. See 42 U.S.C. § 1988(b).  (ECF No. 4 at 16).

Under New York law, a withdrawing attorney has "a charging lien against any recovery or settlement if the fee has not yet been paid for his [or her] services and disbursements . . . unless the [court] decides that the attorney withdrew without good and sufficient cause[.]" Misek-Falkoff, 829 F. Supp. at 663.  New York Judiciary Law § 475 provides:

> From the commencement of an action, special or other proceeding in any court or before any state, municipal or federal department, except a department of labor, or the service of an answer containing a counterclaim . . . the attorney who appears for a party has a lien upon his or her client's cause of action, claim or counterclaim, which attaches to a verdict, report, determination, decision, award, settlement, judgment or final order in his or her client's favor, and the proceeds thereof in whatever hands they may come; and the lien cannot be affected by any settlement between the parties before or after judgment, final order or determination.  The court upon the petition of the client or attorney may determine and enforce the lien.

N.Y. Jud. L. § 475.  "[A]n attorney need not be counsel of record at the time a plaintiff receives judgment or settlement proceeds in order to have a lien on those proceeds, so long as the attorney was counsel of record at one point in the proceedings." Petition of Harley & Browne, 957 F. Supp. 44, 48 (S.D.N.Y. 1997).  "[A]n attorney loses his right to enforce a charging lien if the attorney withdraws or is discharged for cause." Id.  "A hearing is required to determine if [an attorney] was discharged for cause, and, if not, the amount of his fee on a quantum meruit basis[.]" Mason v. City of N.Y., 67 A.D.3d 475, 475 (1st Dep't 2009) (citing Teichner v. W & J Holsteins, Inc., 64 N.Y.2d 977, 978 (1985)).

Determining whether an attorney was discharged "for cause" requires an assessment as to whether "there has been a significant breach of legal duty." Allstate Ins. Co. v. Nandi, 258 F. Supp. 2d 309, 312 (S.D.N.Y. 2003). The clients must show that their former attorney's conduct "constituted a failure to properly represent [their] interests[.]" Costello v. Kiaer, 278 A.D.2d 50, 50 (1st Dep't 2000); see Antonmarchi v. Consol. Edison Co. of N.Y., 678 F. Supp. 2d 235, 241 (S.D.N.Y. 2010) (concluding that former attorney provided "reasonable and necessary services" and did not "violate[ ] any legally or professionally imposed duty" to his client, and therefore, discharge was not for cause and charging lien was permitted); Casper v. Lew Lieberbaum & Co., No. 97 Civ. 3016 (JGK) (RLE), 1999 WL 335334, at *8 (S.D.N.Y. May 26, 1999); see Campagnola v. Mulholland, Minion & Roe, 76 N.Y.2d 38, 44 (1990) ("Where the discharge is for cause, the attorney has no right to compensation or a retaining lien, notwithstanding a specific retainer agreement[.]").

New York courts are generally consistent in finding that an attorney has been dismissed "for cause" when one or more of the following were present:

(1) the attorney's failure to perform under the employment contract; (2) his lack of diligence in so performing; (3) his lack of ordinary skill or care in so performing; (4) his making of demands on the client which violate the terms or exceed the scope of the contract; (5) his taking of actions contrary to the client's interests or objectives; (6) his indulging in some sort of unprofessional conduct while handling the client's affairs; (7) his venting of personal or economic hostility toward the client; and (8) his loss of the client's trust and confidence.

Chen v. LJC Trading N.Y., Inc., No. 19 Civ. 3276 (SJF) (AKT), 2020 WL 10574176, at *5–6 (E.D.N.Y. Nov. 20, 2020).

On a finding that the clients did not discharge the attorney for cause, the court may fix the amount of a charging lien "on a quantum meruit basis, ascertaining the reasonable value of

the legal services rendered up to the date of" the termination.  <u>Sequa Corp. v. GBJ Corp.</u>, 156

F.3d 136, 148 (2d Cir. 1998).

### b.  <u>Application</u>

TCF argues that it "earned its fee"—40% of ███████—by negotiating "a favorable

outcome for Plaintiffs[.]"  (ECF No. 84 at 16).  In addition to their arguments as to why no

settlement agreement was reached while TCF represented them—which we have addressed

in III.A, <u>supra</u>—Plaintiffs argue that they dismissed TCF for cause, such that TCF is not entitled to

any charging lien at all.  (ECF No. 95 at 7–16, 17–19).  They contend that Sells "abandoned" their

interests, engaged in "disloyal and dishonest acts" after DeJesus informed him that Plaintiffs

were rejecting ECFS's settlement offer, and improperly disclosed a privileged communication.

(<u>Id.</u> at 17–22).

Plaintiffs' arguments, whether separately or in combination, fail to demonstrate that TCF

committed "a significant breach of a legal duty."  <u>Antonmarchi</u>, 678 F. Supp. 23d at 241.  Based

on the record before the Court, there is no evidence that TCF "breached the trust and confidence

so crucial to the attorney-client relationship to justify extinguishing its charging lien."  <u>Chen</u>, 2020

WL 10574176, at *7.  As the court noted in <u>Chen</u>, "[c]ases where courts found counsel to have

been discharged for cause involved situations where counsel concealed information from their

clients, utilized abusive language, interfered with their clients' rights to settle, and threatened to

improperly withdraw from the case."  <u>Id.</u> (collecting cases).  Those circumstances do not exist

here.

Plaintiffs claim that Sells "lied" to them "to get them to sign an agreement that would net

him a substantial fee for limited work."  (ECF No. 95 at 19).  They contend that he misled them

into believing "that they had no option to negotiate further and could not walk away from the negotiations[]" with ECFS.  (Id.)  Sells vehemently counters that he acted in Plaintiffs' best interests and holds firm in the belief that "a valid settlement between" Plaintiffs and ECFS "was created by email and in subsequent communications[.]"  (ECF No. 97 at 4, 6–7).

While, as explained above, we disagree with the conclusion that Sells' emails with ECFS's counsel created an enforceable settlement agreement on June 16, 2022, we credit his assertions that he believed he had Plaintiffs' consent to agree to the monetary amount that ECFS offered at that time.  (ECF No. 84 at 5).  Giving Sells the benefit of the doubt, we infer that, when DeJesus told him on August 19, 2022 that she and Wright had changed their mind, he undertook to salvage the possibility of settlement for their benefit and was not intentionally lying to them about their ability to renegotiate the monetary amount.  Cf. Magnacoustics, Inc. v. Ostrolenk, Faber, Gerb & Soffen, 303 A.D.2d 561, 562 (2d Dep't 2003) (holding that clients' "dissatisfaction with [attorneys'] strategic choices" did not establish breach of attorney's standard of care).

As we have noted, the non-disparagement provision did not surface in the settlement negotiations until the Sept. 2 Draft and Sells tried to speak with Plaintiffs about the provisions in that draft, to no avail.  (See § III.A.2.a. supra).  The record also indicates that it was Plaintiffs who chose to cut off communications with Sells, not that he abandoned them.  (ECF Nos. 80-2 at 20; 101-1 ¶ 20; 101-2 ¶ 16).  Finally, although Sells has been somewhat emotional and aggressive in pursuing a charging lien, such as by accusing Plaintiffs of making "patently false" allegations and "mischaracteriz[ing]" his communications with them (ECF No. 97 at 10), it is true that New York law contemplates TCF's entitlement to such a lien against the Settlement, and therefore, in pursuing the lien, he cannot be deemed to be acting adversely to Plaintiffs.  N.Y. Judiciary L. § 475.

While one could envision clearer and more frequent communications between Sells and Plaintiffs and less vituperative expressions toward one's former clients, we ultimately conclude that Plaintiffs have not met their burden to show that TCF "violated any legally or professionally imposed duty" that would support finding that they had dismissed TCF "for cause" thereby depriving TCF of a charging lien altogether. Allstate, 258 F. Supp. 2d at 312. Accordingly, we deem TCF's dismissal to have been without cause.

### 2. Amount of the Charging Lien

Because Plaintiffs did not discharge TCF "for cause," TCF is entitled to a charging lien, albeit on a quantum meruit basis, not in the amount of the contingency fee in the Retainer Agreement. See Love & Madness, Inc. v. Claire's Holdings, LLC, No. 21 Civ. 1913 (SLC), 2022 WL 5138806, at *4–5 (S.D.N.Y. Oct. 5, 2022) (holding that attorneys who were not discharged "for cause" were entitled to charging lien calculated on quantum meruit basis); Teichner, 64 N.Y.2d at 979 ("If the discharge is without cause before the completion of services, then the amount of the attorney's compensation must be determined on quantum meruit basis[.]").

### a. Legal Standard

Absent agreement between the parties fixing the amount of a charging lien, the following factors are helpful in assessing the amount of a charging lien on a quantum meruit basis:

> the difficulty of the matter, the nature and extent of the services rendered, the time reasonably expended on those services, the quality of performance by counsel, the qualifications of counsel, the amount at issue, and the results obtained[.]

Sequa, 156 F.3d at 148 (citing Spano v. Scott, 166 A.D.2d 917 (4th Dep't 1990)). After "consider[ing] all the factors relevant to a quantum meruit fee analysis," courts appropriately "turn[ ] to [a] lodestar analysis to reach a specific dollar figure for the value of the services

rendered[.]" <u>Sequa</u>, 156 F.3d at 148.  The lodestar analysis involves "multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate[,]" <u>Blum v. Stenson</u>, 465 U.S. 886, 888 (1984) (citing <u>Hensley v. Eckerhart</u>, 461 U.S. 424 (1983)), which results in the "lodestar" figure, or, in the Second Circuit's preferred parlance, the "presumptively reasonable fee[.]" <u>Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany & Albany Cnty. Bd. of Elections</u>, 522 F.3d 182, 183 (2d Cir. 2008).  A court may adjust the presumptively reasonable fee "as necessary in the particular case." <u>Blum</u>, 465 U.S. at 888.

"In setting the reasonable hourly rate, a court must determine what a reasonable paying client would be willing to pay for the legal services, in other words, the appropriate market rate for counsel over the course of the number of hours appropriately worked." <u>De La Paz v. Rubin & Rothman, LLC</u>, No. 11 Civ. 9625 (ER), 2013 WL 6184425, at *10 (S.D.N.Y. Nov. 25, 2013).  "Courts are also to consider that a reasonable client wishes to 'spend the minimum necessary to litigate the case effectively.'" <u>Shepherd v. L. Offs. of Cohen & Slamowitz, LLP</u>, No. 08 Civ. 6199 (CM) (LMS), 2010 WL 4922314, at *2 (S.D.N.Y. Nov. 29, 2010) (quoting <u>Arbor Hill</u>, 522 F.3d at 190).  Determining the reasonable hourly rate requires "a case-specific inquiry into the prevailing market rates for counsel of similar experience and skill to the fee applicants['] counsel[,]" which may "include judicial notice of the rates awarded in prior cases and the court's own familiarity with the rates prevailing in the district." <u>De La Paz</u>, 2013 WL 6184425, at *10 (quoting <u>Farbotko v. Clinton Cnty. of N.Y.</u>, 433 F.3d 204, 209 (2d Cir. 2005)).  Reasonable hourly rates may "var[y] by both practice area and location[,]" <u>Gamero v. Koodo Sushi Corp.</u>, 328 F. Supp. 3d 165, 173 (S.D.N.Y. 2018), and "should be 'current rather than historic.'" <u>Dunn v. Advanced Credit Recovery Inc.</u>, No. 11 Civ. 4023 (PAE) (JLC), 2012 WL 676350, at *5 (S.D.N.Y. Mar. 1, 2012), <u>adopted by</u>,

2012 WL 1114335 (S.D.N.Y. Apr. 3, 2012).  In determining whether counsel's hourly rate is reasonable, "the burden is on the fee applicant to produce satisfactory evidence . . . that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." O.R. v. N.Y.C. Dep't of Educ., 340 F. Supp. 3d 357, 363 (S.D.N.Y. 2018).

"The other prong of the lodestar equation is the reasonable hours for which compensation should be awarded." In re Arb. Between Okyere & Houslanger & Assocs., PLLC, No. 1:12 Civ. 01463 (JPO) (GWG), 2015 WL 4366865, at *9 (S.D.N.Y. May 28, 2015).  An attorney seeking fees bears the burden of supporting his claim of hours expended "by accurate, detailed, and contemporaneous time records." Echevarria v. Insight Med., P.C., 102 F. Supp. 3d 511, 516 (S.D.N.Y. 2015).  The records need not specify "the exact number of minutes spent nor the precise activity to which each hour was devoted nor the specific attainments of each attorney." U.S. Football League v. Nat'l Football League, 704 F. Supp. 474, 477 (S.D.N.Y. 1989), aff'd, 887 F.2d 408 (2d Cir. 1989).  "The critical inquiry is whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures." De La Paz, 2013 WL 6184425, at *13.  An award of attorneys' fees may only provide reimbursement for "hours reasonably expended on the litigation[,]" and not for hours "that are excessive, redundant, or otherwise unnecessary[.]" See Hensley, 461 U.S. at 433–34.  The court may deduct hours it deems excessive, see, e.g., Tatintsian v. Vorotyntsev, Nos. 16 Civ. 7203 (GHW), 16 Civ. 8029 (GHW), 2020 WL 2836718, at *6 (S.D.N.Y. June 1, 2020), or, alternatively, "'has discretion simply to deduct a reasonable percentage of the number of hours claimed as a practical means of trimming fat from a fee application.'" Rodriguez ex rel. Kelly v. McLoughlin, 84 F. Supp. 2d 417,

425 (S.D.N.Y. 1999) (quoting Kirsch v. Fleet St., Ltd., 148 F.3d 149, 173 (2d Cir. 1998)); see Sequa, 156 F.3d at 148 ("[T]he determination of the reasonable value of the attorney's services 'is a matter within the sound discretion of the trial court.'").

### b. **Application**

The parties do not address the quantum meruit factors, which, in any event, substantially overlap with the lodestar analysis, so, in the interest of efficiency, we streamline our analysis to arrive at the recommended amount of the charging lien. (See ECF Nos. 84; 95; 97).

### i. **Reasonable Hourly Rate**

Two attorneys at TCF recorded time representing Plaintiffs, Sells at a rate of $1,250 per hour and Malik at a rate of $1,000 per hour. (ECF Nos. 83-9; 83-10). Plaintiffs do not specifically address these hourly rates other than to reference the Mason R&R. (ECF No. 95 at 22).

"Judges in this District have noted that 'rates awarded to experienced civil rights attorneys over the past ten years have ranged from $250 to $600[.]'" Magalios v. Peralta, No. 19 Civ. 6188 (CS), 2024 WL 1856303, at *3 (S.D.N.Y. Apr. 26, 2024) (collecting cases). "[R]ates on the higher end of this spectrum [are] reserved for extraordinary attorneys held in unusually high regard in the legal community." Decastro v. City of N.Y., No. 16 Civ. 3850 (RA), 2017 WL 4386372, at *3 (S.D.N.Y. Sept. 30, 2017). "[B]efore a court may award a rate at the higher end of the range, it should look to whether the [attorneys have] met [their] burden of demonstrating the appropriateness of that rate for the attorney[s] in question. Harrell v. City of N.Y., No. 14 Civ. 7246 (VEC) (DF), 2017 WL 9538163, at *7 (S.D.N.Y. July 20, 2017), adopted as modified sub nom., Calvo v. City of N.Y., 2017 WL 4119280 (S.D.N.Y. Sept. 15, 2017). The degree of success the attorney achieves is "'the most critical factor' in a district court's determination of what

constitutes reasonable attorney's fees[.]"  Najera v. Kurtishi, No. 21 Civ. 01309 (ER), 2024 WL 180867, at *3 (S.D.N.Y. Jan. 17, 2024).

As in the Mason R&R, we respectfully recommend $650 as a reasonable hourly rate for Sells, and $500 as a reasonable hourly rate for Malik.  (Mason Action, ECF No. 102 at 22-23).  Sells does not restate his credentials, but we note that he "has been a practicing litigator and trial attorney since 1989 and has won hundreds of millions of dollars in settlements and verdicts on behalf of discrimination and civil rights plaintiffs[.]"  (Id. at 22 (citing Mason Action, ECF No. 88 at 16)).  Based on our research, the only court to have considered Sells' hourly rate deemed $300 to be reasonable in a maritime personal injury action more than ten years ago.  See In re City of N.Y., No. 03 Civ. 6049 (ERK) (VVP), 2011 WL 7145228, at *23 (E.D.N.Y. Dec. 2, 2011).  TCF has not pointed to, and we have not found, any court awarding $1,250 per hour for an experienced civil rights litigator, let alone Sells himself.  Rather, another court in this District recently deemed a $500 hourly rate reasonable for a partner with over four decades of experience litigating civil rights actions, see Penz v. Washer, No. 18 Civ. 4964 (VB), 2024 WL 3594572, at *5–6 (S.D.N.Y. July 30, 2024), while other courts have recently approved hourly rates of $600 to $650 for experienced civil rights litigators.  See, e.g., Magalios, 2024 WL 1856303, at *5 (deeming $650 hourly rate reasonable); Torres v. City of N.Y., No. 18 Civ. 03644 (LGS) (KHP), 2020 WL 6561599, at *5 (S.D.N.Y. June 3, 2020) (deeming $600 hourly rate reasonable), adopted by, 2020 WL 4883807 (S.D.N.Y. Aug. 20, 2020).  In addition, Sells was not involved in litigating any complicated issues on behalf of Plaintiffs, filing any court documents—aside from the Lien Motion—or engaging in any discovery.  Considering Sells' experience combined with his level of involvement

in the action and precedent from other courts in this District, we respectfully recommend $650 as a reasonable hourly rate for Sells.

Malik also does not restate her credentials, but we note that she "has been a practicing litigator and trial attorney since 2000 and is a recognized authority in the field of civil rights law[.]" (Mason Action, ECF No. 102 at 23 (citing Mason Action, ECF No. 88 at 17)). She was Executive Director of the City of New York Civilian Complaint Review Board and served as an assistant district attorney in Queens. (Id.) Her role seems to have been quite secondary to Sells: nearly all her communications with Plaintiffs and ECFS's counsel were duplicative of Sells' (ECF Nos. 83-9; 83-10), and she has neither participated in the conferences with the Court regarding the Lien Motion nor prepared any of the filings in support. Considering her experience, her relative involvement in the action, and other precedent in this District, we respectfully recommend $500 as a reasonable hourly rate for Malik.

### ii.  **Hours Reasonably Expended**

Sells recorded 68.85 hours representing Plaintiffs, while Malik recorded 40.85 hours. (ECF Nos 83-9; 83-10). Plaintiffs dispute the credibility of TCF's billing records, contending that they "are riddled with block billing, excessive billing, vague billing, and double billing" by Sells and Malik. (ECF No. 95 at 22). Plaintiffs also criticize TCF for failing to reduce the amount they seek in this action by the amount the Court awarded for the same work in the Mason Action. (Id.)

The Court is not required to "set forth item-by-item findings concerning what may be countless objections to individual billing items." Lunday v. City of Albany, 42 F.3d 131, 134 (2d Cir. 1994). We highlight two areas that reflect improper or excessive billing for which a reduction is appropriate. First, Sells and Malik routinely recorded time for internal meetings and calls with

each other.  (See ECF Nos. 83-9 & 83-10 (entries for Apr. 29, 2021, Apr. 30, 2021, May 2, 2021, May 13, 2021, May 14, 2021, May 27, 2021, May 28, 2021, July 8, 2021, Aug. 29, 2021, Sept. 5, 2021, Sept. 22, 2021, Feb. 21, 2022, Apr. 27, 2022, Apr. 28, 2022, Apr. 30, 2022, May 2, 2022, June 2, 2022, June 5, 2022, June 16, 2022, June 26, 2022, July 2, 2022, July 11, 2022, Aug. 31, 2022, & Sept. 1, 2022)).  As this Court has previously noted, "due to corporate scrutiny of outside counsel fees and commonplace rules prohibiting billing for internal conferences, it is highly unlikely counsel would be able to bill a client for this quantity of internal conferences."  Love & Madness, 2022 WL 5138806, at *11 (collecting cases).  Courts apply reductions of up to 75% for such excessive interoffice communications.  See Williams v. Metro-N. R.R. Co., No. 17 Civ. 03847 (JGK), 2018 WL 3370678, at *10 (S.D.N.Y. June 28, 2018).  Second, Plaintiffs correctly observe that the billing records reflect block billing, i.e., composite entries that do not allocate how much time was spent on individual tasks.  While block billing is "disfavored," it "does not automatically preclude recovery for the hours billed by counsel."  Benihana, Inc. v. Benihana of Tokyo, LLC, No. 15 Civ. 7428 (PAE), 2017 WL 6551198, at *3 (S.D.N.Y. Dec. 22, 2017).  Reductions are appropriate, however, "when (1) there is reason to believe that the hours billed were independently unreasonable; (2) the block billing involved aggregating tasks that were not all compensable; or (3) the number of hours block billed together was so high (such as five hours or more) so as to create an unacceptable risk that the aggregated total exceeded the reasonable hours worked on compensable tasks."  Id.  The time records here implicate only the second of these concerns— the inclusion of time for tasks such as internal conferences that are not otherwise compensable for the reasons discussed above—which somewhat impedes our ability to discern how much of

Sells' and Malik's time is reasonably compensable.  See Love & Madness, 2022 WL 5138806, at

*11 (noting that composite time entries impeded ability to discern reasonable number of hours).

Exercising our discretion "to deduct a reasonable percentage of the number of hours

claimed as a practical means of trimming fat" from the requested fees, Rodriguez, 84 F. Supp. 2d

at 425, we conclude that a modest 10% overall reduction of Sells' and Malik's hours is warranted

to account for the billing issues we have noted above.  See Kane v. Nat'l Farm Wholesale Fruit &

Vegetable Corp., No. 17 Civ. 9487 (VSB) (SLC), 2022 WL 20805006, at *4 (S.D.N.Y. Aug. 5, 2022)

(recommending 10% reduction to account for block billing), adopted by, 2023 WL 6795421

(S.D.N.Y. Oct. 13, 2023); see also Gym Door Repairs, Inc. v. Total Gym Repairs, No. 15 Civ. 4244

(JGK) (OTW), 2023 WL 6519626, at *14 (S.D.N.Y. Mar. 31, 2023) (recommending 15% reduction

for block billing), adopted by, 2023 WL 6390156 (S.D.N.Y. Sept. 29, 2023).

Applying the 10% reduction to the number of hours and the recommended hourly rates,

we respectfully recommend that TCF be granted a charging lien against the Settlement in the

amount of $56,945.00, calculated as follows:

| Timekeeper | Requested Rate | Awarded Rate | Requested Hours | Hours Reduced by 10% | Total |
|---|---|---|---|---|---|
| Sells | $1,250 | $650 | 65.85 | 59.3 | $38,545.00 |
| Malik | $1,000 | $500 | 40.85 | 36.8 | $18,400.00 |
| **TOTAL** | | | | | **$56,945.00** |

## IV. CONCLUSION

For the reasons set forth above, we respectfully recommend that:

(1)  The Settlement Motion be DENIED;

(2)  The Lien Motion be DENIED without prejudice; and

(3)  Plaintiffs' request for discovery be DENIED.

In the alternative, should the Settlement Motion be granted, we respectfully recommend that the Lien Motion be granted in part and denied in part, to the extent that TCF be granted a charging lien against Plaintiffs' recovery in this action in the amount of $56,945.00.

Dated:      New York, New York
            July 15, 2025

_____
SARAH L. CAVE
United States Magistrate Judge


\*                       \*                       \*

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen (14) days (including weekends and holidays) from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.  See also Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D) or (F)).  A party may respond to another party's objections within fourteen (14) days after being served with a copy.  Fed. R. Civ. P. 72(b)(2).  Such objections, and any response to objections, shall be filed with the Clerk of the Court.  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), (d), 72(b).  Any requests for an extension of time for filing objections must be addressed to Judge Oetken.

**FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.**  See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), (d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).